CHRISTIAN, J.
This is an appeal from a decree of the Circuit court of the city of Alexandria. The transcript of the record discloses the following facts: Maris Taylor and Edgar S. Hutchison, by articles of agreement entered into on the 6th day of May 1853, formed a copartnership as merchants, for carrying on the dry goods business in the city of Alexandria. The business was conducted by them in that city until the spring of 1859, when they removed to the city of Washington, where they conducted the same business under the same articles of copartnership. On or about the 24th day of May 1861, shortly after the commencement of the late civil war, Hutch-ison left the city of Washington and came to Virginia, where his family then resided, and never returned to Washington until after the close of the war. Whatever may have been his intention when he left Washington as to his purpose to return, he remained within the Confederate lines, united his fortunes with those of the Southern Confederacy, and was a part of the time he remained in Virginia employed as a clerk in the treasury department of the Confederate government located at Richmond. While not thus employed, he was engaged in mercantile pursuits in another part of the state within the Confederate lines. *It appears from certain letters filed in the record, that after the close of the war Hutchison visited Washington, had an interview with his former partner, Taylor, and was furnished by him with an account or statement of the settlement of the copartnership made by Taylor on the 1st day of August 1861. In one of these letters, dated July 15th, 1865, Hutchison complains that Taylor had taken the stock on hand on that day (1st August 1861) at a discount of thirty-three and a third per cent. He protests against the allowance of so large a depreciation, and insisted that Taylor had sold these identical goods at a profit over and above the original cost. He also objects that, in the statement furnished by Taylor, of what is termed the ‘•'confidential debts” of Taylor and Hutchison, are embraced some $3,400 of money, due by Taylor individually, and borrowed before he, Hutch-ison, became connected with the business, and that this amount ought not to be embraced in the liabilities of the firm. He also protests that the estimate made by Taylor, of the solvent debts due the firm, was too low; and concludes this letter by saying: “Inasmuch as you settled with our creditors at forty cents in the dollar, that will form the basis of the settlement between you and myself; and when the corrections above referred to are made, and which I claim I am justly entitled to, it will exhibit quite a different result from that now shown on your books.”
This letter bears date 15th July 1865, and it is worthy of special notice, that Hutch-ison does not then claim that there was no dissolution of the partnership at the time the settlement referred to in this letter was made by Taylor, nor is there any claim, or hint of any claim, on his part to any participation in profits made after August 1st, 1861, the date of Taylor’s settlement ^furnished to Hutchison. He makes no objection that Taylor retained the partnership goods, but his objection is, that he retained them at “a discount of thirty-three and a third per cent.”
His complaint in July 1865 is three-fold: --1st. That the partnership goods were retained by Taylor at less than one-third of their value. 2d. That the firm was charged with confidential debts, which Taylor alone was bound to pay. 3d. That the estimate made by Taylor, of the solvent debts due the firm of Taylor & Hutchison, was far below their real value. But there was then no complaint that the partnership was not in fact dissolved, nor was there any claim to a participation in the profits made after the 1st August 1861.
In March 1866 Hutchison filed his bill in the Circuit court of the city of Alexandria against his former partner, in which he alleges that at the time he left Washington, in May 1861, the firm of Hutchison & Taylor had on hand a stock of goods worth at least $15,000, and also a large amount of *474 solvent debts due the firm; that when he returned to Washington, in May 1865, he was informed by his copartner that he had dissolved the copartnership on the 1st day of August 1861; that this pretended dissolution was in violation of his rights and of the terms of the articles of copartnership; that said pretence of dissolution was made for the purpose of defrauding complainant; that the defendant had appropriated the assets of the firm to his own use, and refused to render any just account thereof to complainant. He prays that the defendant may be compelled to account for the assets of the firm, and that a commissioner of the court should be ordered to take an account of the partnership transactions; that the partnership should be dissolved; and *that the defendant should be decreed to pay to him the just proportion due him.
The defendant Taylor answered this bill. He admits the co-partnership by which the plaintiff and defendant conducted the dry goods business first at Alexandria and af-terwards at Washington. He exhibits with his answer the articles of co-partnership, by which it was stipulated that the said co-partnership could at any time be disl solved by mutual consent, and further that each partner covenanted to give his whole time and attention to the business of the firm; and the said articles of agreement-provide that in the event of either partner failing to keep and perform the covenants of said agreement, that the other partner should have the right immediately to dissolve the partnership. After thus setting out the articles of co-partnership and averring that the business^ so far from being prosperous had resulted in a clear loss of over $6,000, he states that “at the time complainant left the city of Washington, on or about the 22d May 1861, not contemplating a return to said city, and well knowing that the partnership affairs were not in a prosperous condition, he consummated a purpose which he had before frequently intimated, and proposed to defendant a dissolution of the co-partnership, to which the defendant consented; and at the same time it was agreed, that this defendant should take all the stock and debts due the partnership, to be accounted for at an appraisement to be made by J. Marion Hart, the bookkeeper of the' concern, well experienced in mercantile matters.” He exhibits with his answer also the appraisement and account of Hart, made, as he avers, in accordance with this agreement of dissolution by mutual consent, bj' which it appears that *while the assets of the firm amounted to $15,443.01, its liabilities reached the sum of $36,950.96.
He also files with his answer a notice, which appeared at this time in the Washington papers, of the dissolution of the firm of Taylor and Hutchison, and the continuance of the business in the name of Maris Taylor. He also exhibits with his answer,an account of the partnership transactions, showing that the firm was indebted to Taylor in the sum of $12,000.
Various accounts were ordered by the Circuit court of Alexandria, both of the partnership transactions up to the time of the alleged dissolution and of the profits made by Taylor after the alleged dissolution. That court was of opinion that Hutchison was entitled to a share of the profits made by Taylor after the alleged dissolution of the partnership, and accordingly decreed to him, as his share, the sum of $6,368.70, with interest from 21st day of March 1865. Prom this decree an appeal was allowed to this court.
In the court below one of the great points in controversy was whether, in point of fact, there had been a dissolution of the partnership as alleged by the defendant.
Upon this point there were voluminous depositions, containing conflicting and contradictory testimony.
I do not deem it necessary, in my view of the case, to pass upon this question of fact so much discussed at the bar.
It is immaterial, to the decision of the legal question involved, how the partnership was dissolved, whether by mutual consent or by operation of law, the result of that dissolution is precisely the same, as it affects the rights of the parties in this case. Conceding that the averment in Taylor’s answer, “that before Hutchison left Washington, in May 1861, there was a mutual ^agreement to dissolve their copart-nership,” is not sustained by the proofs in the cause, yet it is clear, upon the undisputed facts, that there was a dissolution, growing out of the separation of the parties on different sides of the belligerent lines during the war between the northern and southern states, commencing in the spring of 1861.
It is conceded that, in May 1861, Hutch-ison left the city of Washington, came to Virginia, where his family resided, and remained in this state until after the close of the war, where he was engaged part of the time in mercantile pursuits for himself, and part of the time as a clerk in the treasury department of the Confederate States located at Richmond. Whatever may have been his intention when he left in May 1861, as to his returning to Washington, he, in fact, became domiciled in Virginia, united his fortune with the Southern Confederacy, remained during the whole war within the Confederate military lines a subject of that government. He thus became domiciled in Virginia, and a citizen of this state, then at war with the United States, at the capitol of which his partner was domiciled.
That this state of things operated ipso facto as a dissolution of the partnership between them is now too well settled to admit of doubt or discussion. It is hardly necessary to refer to authorities on a point so well established. I will quote, however, a single extract from Mr. Justice Story (see Story on Partnership, $ 315, cases there *475 cited) as apposite and conclusive. He says (p. 491, ed. 1859) dissolution of partnership by a public war between the countries of which the partners are respectively subjects, “would seem to be a necessary result of principles of public law well established and clearly defined. By a declaration *of war, the respective subjects of each country became positive enemies of each other. They can carry on no commercial or other intercourse with each other; they can make no valid contracts with each other; they can institute no suits in the courts of either country; they can, properly speaking, hold no communication of an amicable nature with each other, and their property is mutually liable to capture and confiscation by the subjects of either country. Now it is obvious from these considerations that the whole objects and ends of the partnership, the application of the joint funds, skill, labor and enterprise of the parties in the common business thereof, can no longer be attained. The conclusion, therefore, would seem to be absolutely irresistible that this mutual supervening incapacity must, upon the very principles applied to all analogous cases, amount to a positive dissolution of the partnership.”
After an interesting and instructive discussion of the subject, the author concludes: “The just inference from all these considerations seems therefore to be, that in all; these cases there is an utter incompatibility I created by operation of law, between the parties as to their respective rights, duties and obligations, both public and private; and therefore that a dissolution must necessarily result therefrom, independent of the will or act of the parties.” Id. I 316.
This whole subject came up successively, before the Supreme court of New York and the Court of Errors of that state in the case of Griswold v. Waddington, 15 John. R. 57; S. C. 16 John. R. 438. The masterly opinions of Mr. Chief Justice Spencer and of Chancellor Kent are indeed judicial discussions of rare ability and research, which have been recognized as authority in this state, and every other state in the *Union, where this question has come up for judicial investigation. We would refer to and adopt the exhaustive reasoning of these cases as re-affirming the principles laid down by Mr. Justice Story, and establishing the law for this state, as ■well as of every other state of the Union where the question has been considered.
We must therefore conclude that whatever the fact may be as to the dissolution of the partnership by mutual consent, as contended for by Taylor, it is certain that the partnership was dissolved by operation of law, when, in May 1861, Hutchison left the city of Washington and became domiciled In Virginia, and a citizen of that state, then at war with the United States.
It being thus settled that there was a dissolution of the partnership by operation of law, the main question we now have to decide is what was the interest of Hutchison in the partnership after its dissolution? Is he entitled to a share of the profits of the business made by Taylor after the dissolution?
It is insisted by the learned counsel for the appellee, that it is a uniform rule, of universal application, that whenever the continuing partner, after dissolution, carries on the business with the partnership stock, he is liable to the outgoing partner for his full share of the profits. This is certainly the general rule, and is founded upon sound principles and unquestioned authority. The reason of the general rule is plain. The right to share in the profits resulting from a continuance of the business after dissolution of the partnership, is founded upon the exposure of the property of the partner who goes out to the risk of the new business. But suppose the outgoing partner has in fact no property in the concern to be exposed; suppose *at the date of the dissolution he has drawn out the whole of the capital he had put in the concern, or that he is indebted to the concern in an amount far exceeding his interest in it. Suppose it appears that at the date of dissolution he has not only drawn out his capital, but has also withdrawn his labor, skill and services, and that the liabilities of the concern are far in excess of the assets, and that these assets have been faithfully applied to the payment of the debts of the firm by the continuing partner, and, in point of fact, that the outgoing partner has thus no interest in the concern which can be put to the hazard of insolvency or bankruptcy. In such cases the principle of the rule contended for cannot apply, for the reason of the rule ceases to exist.
But it is insisted by the appellee’s counsel, that inasmuch as the continuing partner did not sell out the old stock at public auction, but continued it in the business, the retiring partner is entitled to share in the profits independent of the state of the accounts between the partners at the date of the dissolution.
It is claimed that it is immaterial what the condition of the partnership affairs was at the time of dissolution; what was the interest of the partners respectively; what proportion of the capital had been contributed by either partner, or whether the outgoing partner had withdrawn his input, yet if the stock of the firm is carried over into the new business, and not sold at public auction, the outgoing partner is still entitled to have an account and share in the profits. This proposition cannot be maintained in the broad and unqualified manner in which it is stated. The authorities relied upon do not sustain it; but, on the contrary, it seems to be well settled that there is no uniform rule applicable alike to all cases. In Parsons *on Partnership, p. 524, the author referring to a number of decisions on this subject, says: “In regard to the terms of the account and settlement, and the charges, credits or allowances to be made, it has been conceded by the highest authority, that specific rules *476 are of little use, because the justice of everj' case requires' ÍRat its peculiar facts and merits, the nature of the trade, the conduct of the parties, and all the various circumstances which affect the rights of the parties, must be taken into consideration, to determine what they are or should be.” The same author says: 1 ‘A sale is, generally speaking, that method of disposing of the property, or facilitating its division, which is less open to fraud or mistake, and is therefore much favored. * * * * Still it must always be possible that the peculiar circumstances of the case may make a sale injurious, and that the true interests of all parties may be better preserved and protected without it. ’ ’ Id. 525.
In Willitt v. Blanford, 1 Hare’s R. 253, Vice Chancellor Wigram, after reviewing all the English cases decided up to that time (1842)- said: “I feel myself bound therefore, by authority and reason, to hold that the nature of the trade, the manner of carrying it on, the capital employed, the state of accounts between the parties, &c., may materially affect the rights of the parties. ”
. Again he says, in the same case, page 269, “I have again considered the subject, and read the case to which I was referred, and I remain of the opinion I expressed at the close of the argument, that there is no rule of this court applicable alike to all cases, and that there is no rule which is so established, or general in its application, that it is to be taken to be the general rule, until circumstances are shown which displace *it. The facts of each case must be fully brought under the view •of the court before it can be in a position to state what justice to the parties seeking its protection may require with due regard to the interests of other parties. No one can attend to the elaborate judgments of Lord Eldon in Crawshaw v. Collins, Brown v. DeTastet, and even in Cook v. Cullingridge, without being satisfied that his mind saw the impossibility of subjecting cases so various as those of trading partnerships to any universal rule. And I think it is impossible to consider the subject abstractly upon authority, without feeling satisfied that justice would be endangered by an attempt to subject all cases of this description to any uniform rule.” See also Parsons on Partnership, p. 523, and cases there cited in note.
In Wedderburn v. Wedderburn, 15 Eng. Ch. R. 722, 752, Lord Cottenham held that there was no absolute rule on this subject, but each case must depend upon its own peculiar facts, depending upon the state of accounts, the capital employed, &c.
In the same case, coming up again in 1856, it was held by Sir John Romily, that the liability to account for the profits derived from the trade carried on (after one partner had retired, or was dead, or became bankrupt), must depend on the nature of the trade, the mode of carrying it on, the capital employed, the state of account between the parties, and the conduct of the parties afterwards.
That the rule contended for by the appel-lee’s counsel is not a universal one, is shown by a remark of Lord Eldon, in Brown v. De Tastet, Jacob R. 284, in which the doctrine supposed to be established in Crawshaw v. Collins, 2 Russ. R. 525, are brought in review, and considered productive of great hardship.
*The Eord Chancellor observed, in reply to the remarks of the counsel upon the case of Crawshaw v. Collins, that he did not mean to say, that in all cases of partnership the consequence of carrying on the business would be that the profits should be divided, as if the parties had not died or become bankrupt, but that such might be the law in some cases.
The general principle ought to be this: that as it is quite competent to the parties to settle the accounts and to mark out the relation between themselves as debtor and creditor, so when there is a non-settlement-of the account (though a settlement may sometimes introduce great hardship and difficulty), yet those who choose to employ the property of another for the purposes of their trade, exposing it to all the risks of insolvency and bankruptcy, have no right to say that the account shall not be taken if it can be taken without incurring difficulties which might embarrass the house to such an extent as to make it unjust to demand it.”
It would seem, therefore, that the right to share in the profits resulting from a continuation of the business, after the dissolution of the partnership, is founded upon the exposure of the property of the partner who goes out to the risks of the new business; and that if the partner going out has no property to be thus exposed, the principle cannot apply. See also Collyer on Part., 181, 182; and Hyde v. Entie, 4 Maryland Ch. Decisions, p. 80.
Applying these doctrines to the case before us, we are bound to conclude that Hutchison was not entitled to an account or share of the profits made by Taylor after a dissolution of the partnership. All he was entitled to was to call upon the continuing partner, Taylor, for a proper application of the assets on hand at the dissolution *of the partnership, to the payment of the liabilities existing at the date of the dissolution. The law having by its interdict put an end to a partnership between two partners, who had become alien enemies, Taylor could not bind Hutch-ison to any debts created by him upon the credit of the firm. Hutchison was no more bound than if he had been dead or a bankrupt, or the partnership had been dissolved by mutual consent.
Nor was Hutchison entitled to a share of the profits made by Taylor after the dissolution. When he left Washington he had withdrawn his whole input capital. According to the settlement of the partnership transactions made by a trusted agent of the firm, J. Marion -Hart, the bookkeeper, the *477 assets on hand on the first day of August 1861, including stock, debts, fixtures and cash on hand, amounted to $15,848.99, while the total liabilities of the firm amounted to the sum of $37,098.25; of which latter amount $12,749.50 was due from the firm to Taylor. So that there was, according to this statement, an excess of liabilities over assets of $21,189.26.
This statement is modified, however, by the estimate of the assets made in the mode directed by the decree of the Circuit court, which increased the amount of assets to $21,728.46, and reduced the liabilities by arrangement made with northern creditors by compromise made by Taylor, to $26,234.87; $12,749.50 of which was due to Taylor. This is the most favorable estimate which can be made for Hutchison, and is not excepted to by him; and this still shows an excess of liabilities over the assets of $4,506.41.
It will thus appear, that at the dissolution of the partnership the firm was indebted to Taylor upwards *of $12,000; Hutchison had withdrawn his capital; and the assets on hand, under the most favorable aspect of the case, were nearly $5,000 less than sufficient to meet the liabilities of the firm. Having withdrawn his capital, as well as his personal services, and being largely indebted to Taylor, and the liabilities of the firm being largely in excess of its assets, and the partnership having been dissolved by operation of law, he cannot now participate in the profits made by Taylor after dissolution of the partnership. The right to share in the profits resulting from a continuation of the business after dissolution is founded upon the exposure of the property of the partner who goes out, to the risks of the new business. In the case before us, Hutchison had no interest in the partnership except that the assets should be applied to the discharge of the liabilities of the firm at the time of dissolution. This was not such an interest as could be exposed to the risks of the new business. The partnership could not exist during the war, because the partners were alien enemies. Taylor could not have made any contract by which Hutchison would have been bound as his partner. He was bound to account to Hutchison for his share of the stock at a fair valuation, no matter what the result of his business had been. If he had suffered loss, he would have had to bear the loss alone. Being alien enemies, living on different sides of belligerent lines, they could not share in the profits made by each other. Even if, by express contract, they had bound themselves to share in profits made in their business during the war, such a contract would have been unlawful, and could not be enforced; for that would have created such a confusion of obligations between the law of partnership and the law of war, such a conflict between their duty as partners and their duty as ^patriots, as public policy imperatively prohibits. See Griswold v. Wad-dington, 16 Johns. R. 438, 489.
Now it is apparent, from the whole record in this case, that if after the commencement of the war, and after Hutchison had left Washington, and changed his domicil to Virginia, Taylor had sold out the stock of the firm at public auction, Hutchison would not have had the slightest pretence of a claim that Taylor should account to him for his share of the proceeds of sale. Instead of a sale at public auction, Taylor took the stock at a valuation fixed by a disinterested party, and one familiar with the stock, the clerk and bookkeeper of the firm. How does this change the question or affect the rights of Hutchison? It has already been seen that while a sale is, generally speaking, the mode of disposing of the partnership property, which is least open to the danger of fraud or mistake, and is therefore much favored, yet, according to Parsons (supra), “still it must always be possible that the peculiar circumstances of the case may make such sale injurious, and that the true interest of all parties may be better preserved and protected without it.” Now the main ground upon which a sale at public auction is “much favored” is, that at such sale both partners may be present and bid for the stock, and prevent a sacrifice.
In this case, one of the partners (Hutch-ison) could not have been present, and the other partner could have bought the stock without an interested competing bidder being present to make him pay its value. This, it seems to me, is one of the cases which comes within the very terms of the exception stated by Mr. Parsons.
There can be no doubt that if the stock of goods *had been sold at public auction in the absence of Hutch-ison, Taylor would have bought them at a much smaller sum than the valuation estimated by Hart. And certainly it must be conceded by all, that if there had been such sale, Hutchison could not have had the slightest pretence of a claim for a share in the profits made by Taylor after the dissolution of the partnership.
The taking the stock at valuation, instead of sale, was manifestly to the advantage of Hutchison; and if he could not assert his claim to a share of profits in the event of a sale, he ought not now to assert it. Upon the whole case, I am of opinion that the decree of the Circuit court is erroneous. The decree ought to be reversed and the bill dismissed.
The other judges concurred in the opinion of Christian, J.
Decree reversed.